IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

ANTHONY D. AMAKER,

                            Plaintiff,

        v.                              Civil Action No.
                                        9:01-CV-0877 (FJS/DEP)


T. KELLEY, *et al.,*

                            Defendants.
_____

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

ANTHONY D. AMAKER, *Pro Se*


FOR DEFENDANTS:

HON. ANDREW M. CUOMO            DAVID B. ROBERTS, ESQ.
Office of the Attorney General  Assistant Attorney General
State of New York
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

        Plaintiff Anthony D. Amaker, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action

pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. Plaintiff's complaint, as amended, contains an amalgamation of claims based upon a series of events alleged to have occurred at the two correctional facilities in which he was housed during the relevant period, naming in excess of fifty individuals as well as the New York State Senate and Assembly as defendants, and seeking both injunctive and monetary relief.

Currently pending before the court are two motions brought by the defendants.  In the first, defendants seek the entry of summary judgment dismissing plaintiff's claims on a variety of grounds, principally on the merits, though additionally urging their entitlement to qualified immunity from suit.  One of the named defendants, Rafael Rivera, a corrections officer, has additionally moved requesting dismissal of plaintiff's claims against him for failure to state a claim upon which relief may be granted, arguing that plaintiff's allegations are facially insufficient to support a cognizable claim against him.  For the reasons set forth below I recommend that defendants' summary judgment motion be granted, and in light of that recommendation find it unnecessary to address defendant Rivera's separate motion.

I.     BACKGROUND

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services (the "DOCS"). Amended Complaint (Dkt. No. 78) ¶ 3.  Plaintiff's incarceration results from a 1989 conviction for murder in the second degree, for which he was sentenced to a period of imprisonment of between twenty-five years and life.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 229-2) ¶ 1.  At the times relevant to his claims plaintiff was designated initially to the Clinton Correctional Facility ("Clinton"), where he was housed beginning in June of 1998, and later the Upstate Correctional Facility ("Upstate"), into which he was transferred on or about October 31, 2001.[1]  Amended Complaint (Dkt. No. 78) ¶¶ 3, 5, 21.

In his amended complaint plaintiff has interposed a wide range of claims, many of which are unrelated and some of which, as will be seen, were included in a subsequent action brought by the plaintiff in this court, based upon events occurring at Clinton, and later at Upstate, between

_____

[1]     Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day.  *See Samuels v. Selsky*, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

3

June, 1998 and January of 2002.  One of the more prominent claims now asserted by the plaintiff concerns efforts by DOCS authorities to obtain a Deoxyribonucleic Acid ("DNA") sample from him as authorized under New York's DNA Indexing Statute, N.Y. Executive Law Art. 49-B, as well as disciplinary action taken by prison officials based upon his refusal to comply with that request.  Plaintiff also alleges, *inter alia*, that defendants were deliberately indifferent to his serious medical needs, and that he was 1) exposed to inhumane conditions of confinement; 2) denied meaningful access to the law library facilities and deprived of court papers; 3) retaliated against for exercising his right to file grievances and seek other forms of redress; 4) subjected to unlawful racial discrimination and cell searches; and 5) unlawfully required to pay for food and spices required to enjoy meals consonant with his religious beliefs.[2]

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on June 1, 2001, Dkt. No. 1, and on June 6, 2002 filed a second amended complaint  –  the operative pleading

---

[2]      The specifics of plaintiff's various causes of action will be discussed in more detail in the portions of this report addressing each grouping of claims.

currently before the court.[3]  Dkt. No. 78.  In his amended complaint,

plaintiff asserts a variety of constitutional and statutory claims against fifty-

five named defendants, including the Commissioner of the DOCS and

many of the agency's employees.[4]  *Id.*

Since its inception some seven years ago, this case has developed

a tortured procedural history which has included the filing of more than

one motion for interim injunctive relief and various interlocutory appeals,

all of which have been dismissed.  Now that discovery has been

completed, by motion filed on February 13, 2007 defendants have moved

for summary judgment dismissing plaintiff's claims on a variety of grounds.

---

[3]      In addition to this action, plaintiff has commenced two other suits in this court.  The first, *Anthony D. Amaker v. Glenn S. Goord, et al.*, Civil Action No. 03-CV-1003 (NAM/DRH) (N.D.N.Y., filed 2003) ("*Amaker II*"), addresses incidents occurring at Upstate as well as subsequent to plaintiff's transfer into the Downstate Correctional Facility, and later to the Great Meadow Correctional Facility.  A review of the relevant pleadings from that case reflects significant overlap between the claims asserted in that action and those now before the court.  The other action, commenced by plaintiff on March 22, 2006 and encaptioned *Anthony D. Amaker, et al. v. Glenn S. Goord, et al.*, Civil Action No. 06-CV-0369 (GLS/RFT) (N.D.N.Y., filed 2006) ("*Amaker III*"), was transferred to the Western District of New York on July 6, 2006, pursuant to 28 U.S.C. § 1404(a).

[4]      Also named as defendants in plaintiff's amended complaint were the New York State Senate and the New York State Assembly. *See* Dkt. No. 78.  Those entities, which are clearly not parties amenable to suit, have not been formally joined as defendants in the action, however, in light of the issuance of an order on May 13, 2002 denying plaintiff's application for leave to amend to the extent that he sought permission to add them as defendants.  *See* Dkt. No. 75.

Dkt. No. 229.  In addition, Corrections Officer R. Rivera, a named defendant who has yet to answer plaintiff's complaint, has also moved seeking dismissal of plaintiff's claims against him pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted as against him.  Dkt. No. 237.  Plaintiff has since responded to defendants' summary judgment motion by the filing on May 25, 2007 of a memorandum, affidavit, and various other materials, Dkt. No. 240, but has not opposed defendant Rivera's dismissal motion.[5]

Defendants' motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York

---

[5]     Among plaintiff's submissions in opposition to the pending motions is a request that the court strike an affirmation submitted by defendants' counsel, Jeffrey P. Mans, Esq., as well as declarations of Dr. Vonda Johnson and James Bell, from the record.  Dkt. No. 240-03.  Having reviewed the Johnson and Bell declarations, I discern no basis to strike them from the record.  Turning to Attorney Mans' declaration, I find that it appears to be offered principally to describe the exhibits being submitted in connection with defendants' motion and to set forth legal argument to supplement their memorandum.  While the inclusion of legal argument in such an attorney's affidavit is ordinarily not appropriate, *Donahue v. Uno Restaurants, LLC*, No. 3:06-CV-53, 1006 WL 1373094, at *1 n.1 (N.D.N.Y. May 16, 2006) (McAvoy, J.), and it is doubtful that defendants' attorney is positioned to include in an affidavit assertions of fact beyond his personal knowledge, *Housing Works, Inc. v. Turner*, No. 00 Civ. 1122, 2003 WL 22096475, at *1 (S.D.N.Y. Sept. 9, 2003), I have chosen not to strike the affidavit, and instead to consider it solely for the limited purpose for which it is being offered.

Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

  A.   Standards of Review

    1.   Dismissal Motion Standard

  A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which is particularly unexacting in its requirements.  Rule 8 of the Federal Rules of Civil Procedure requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Absent applicability of a heightened pleading requirement such as that imposed under Rule 9, a plaintiff is not required to plead specific factual allegations to support the claim; rather, "the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, __ U.S. __, 127 S. Ct. 2197, 2200 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1964 (2007) (other quotations omitted)); *cf. Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (acknowledging that a plaintiff may properly be required to illuminate a claim with some factual

allegations in those contexts where amplification is necessary to establish

that the claim is "plausible").  Once the claim has been stated adequately,

a plaintiff may present any set of facts consistent with the allegations

contained in the complaint to support his or her claim.  *Twombly*, 127 S.

Ct. at 1969 (observing that the Court's prior decision in *Conley v. Gibson*,

355 U.S. 41, 78 S. Ct. 99 (1957), "described the breadth of opportunity to

prove what an adequate complaint claims, not the minimum standard of

adequate pleading to govern a complaint's survival").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept

the material facts alleged in the complaint as true, and draw all inferences

in favor of the non-moving party.  *Cooper v. Pate*, 378 U.S. 546, 546, 84

S. Ct. 1722, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d

292, 300 (2d Cir.), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003);

*Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.).

The burden undertaken by a party requesting dismissal of a complaint

under Rule 12(b)(6) is substantial; the question presented by such a

motion is not whether the plaintiff is likely ultimately to prevail, "'but

whether the claimant is entitled to offer evidence to support the claims.'"

*Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d

435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69

F.3d 669, 673 (2d Cir. 1995) (other quotations omitted)).  Accordingly, a

complaint should be dismissed on a motion brought pursuant to Rule

12(b)(6) only where the plaintiff has failed to provide some basis for the

allegations that support the elements of his or her claim.  *See Twombly*,

127 S. Ct. at 1969, 1974; *see also Patane v. Clark*, 508 F.3d 106, 111-12

(2d Cir. 2007) ("In order to withstand a motion to dismiss, a complaint

must plead 'enough facts to state a claim for relief that is plausible on its

face.'") (quoting *Twombly*).  "While *Twombly* does not require heightened

fact pleading of specifics, it does require enough facts to 'nudge

[plaintiffs'] claims across the line from conceivable to plausible.'" *In re

Elevator Antitrust Litig.*, 502 F.3d 47, 50 (3d Cir. 2007) (quoting *Twombly*,

127 S. Ct. at 1974).

When assessing the sufficiency of a complaint against this

backdrop, particular deference should be afforded to a *pro se* litigant

whose complaint merits a generous construction by the court when

determining whether it states a cognizable cause of action.  *Erickson*, 127

S. Ct. at 2200 ("'[A] *pro se* complaint, however inartfully pleaded, must be

held to less stringent standards than formal pleadings drafted by

lawyers.'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord*, 320 F.3d 346, 350 (2d Cir. 2003) (citation omitted); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.).  In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated.  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires").

          2.   <u>Summary Judgment Standard</u>

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is

"material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When the entry of summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing

11

party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B.   DNA Testing

In or about September of 2001, prison officials at Upstate initiated efforts to obtain a DNA sample from the plaintiff.  Amended Complaint (Dkt. No. 78) ¶¶ 18-19.  Plaintiff's refusal to cooperate with those efforts led to the issuance by Corrections Sergeant Cayea of a misbehavior report charging Amaker with failing to obey an order.  *Id.*; *see also* Mans

Aff. (Dkt. No. 229-14) Exh. B.  A Tier II hearing was convened to address the charges lodged in the misbehavior report, resulting in a finding of guilt and the imposition of a penalty which included thirty days of keeplock confinement, with a corresponding loss of privileges.[6,7]  *Id*.

On October 10, 2001 plaintiff was again directed to provide a DNA sample, but similarly refused to honor the request.  Amended Complaint (Dkt. No. 78) ¶ 20.  A second misbehavior report was issued to Amaker as a result of that failure to comply with the directive of prison staff, resulting

---

[6]     The DOCS conducts three types of inmate disciplinary hearings.  Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU).  Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

[7]     Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities.  *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); *Warburton v. Goord*, 14 F. Supp.2d 289, 293 (W.D.N.Y. 1998) (citing *Gittens*); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995)). Inmate conditions while keeplocked are substantially the same as in the general population.  *Lee v. Coughlin*, 26 F. Supp.2d 615, 628 (S.D.N.Y. 1998).  While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise.  *Id.*  Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals, *Id.*  The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends.  *Id.*

in a finding of guilt, following a Tier III hearing, and the imposition of a

penalty which included six months of disciplinary confinement in a special

housing unit ("SHU"), again with a corresponding loss of privileges.[8]  *Id.*;

*see also* Mans Aff. (Dkt. No. 229-14) Exh. C.

On December 26, 2001 the DOCS Deputy Commissioner for

Correctional Facilities, Lucien J. LeClaire, Jr., wrote to the plaintiff to

inform him that in the event of an inmate's refusal to provide requested

DNA samples corrections officials were authorized to obtain the required

sample through the use of reasonable force, and that "appropriate

additional disciplinary sanctions" could be imposed, further noting that

upon investigation into the matter, apparently based upon a complaint

lodged by the plaintiff, it was determined that in the course of their

dealings with him corrections staff had "acted appropriately and in

accordance with policies and procedures set by the [DOCS] governing

DNA testing."  Amended Complaint (Dkt. No. 78) Exh. A-5; *see also* Mans

_____

[8]        In New York, SHU cells are utilized for segregating prisoners from
general population areas for various reasons including, predominantly, disciplinary
purposes. *Lee v. Coughlin*, 26 F. Supp. 2d 615,  618 (S.D.N.Y. 1998) (citing 7 NYCRR
pts. 253, 254, and 301).  The conditions typically experienced by inmates confined in
an SHU include two showers per week; one hour of outdoor exercise per day;
unlimited legal visits; one non-legal visit per week; access to counselors; access to
sick call; cell study programs; and access to library books.  *Husbands v. McClellan*,
990 F. Supp. 214, 218 (W.D.N.Y. 1998) (citing 7 NYCRR pt. 304).

Aff. (Dkt. No. 229-14) Exh. D.  Despite that letter, Amaker persisted in his refusal to provide the required DNA sample, leading to further disciplinary action against him.[9]  Amended Complaint (Dkt. No. 78) ¶¶ 23-26.

Among the claims interposed by the plaintiff in his second amended complaint are those surrounding the requirement that he provide a DNA sample pursuant to New York's Statutory DNA database regime and the imposition of the discipline based upon his repeated refusals to comply with directives to that effect.  In asserting those claims plaintiff does not chart a new path, but instead raises claims similar to those which have previously been raised by him and other fellow inmates, and uniformly rejected by the courts.

On the heels of the decision by the New York Court of Appeals in *People v. Wesley,* 83 N.Y.2d 417, 611 N.Y.S.2d 97, 633 N.E.2d 451 (1994) holding, *inter alia,* that DNA evidence is admissible in a criminal trial, the New York Legislature enacted a series of provisions aimed at the creation of a DNA databank.  *Zarie v. Beringer*, No. Civ. 9:01-CV-1865, 2003 WL 57918, at *3 (N.D.N.Y. Jan. 7, 2003) (Sharpe, M.J.).  Among

---

[9]      The subsequent disciplinary proceedings necessitated by virtue of plaintiff's refusal to provide a DNA sample are chronicled in a report and recommendation issued in another action brought by plaintiff Amaker.  *See Amaker II,* Dkt. No. 160, slip op. at pp. 3-4.

those was a statute authorizing the gathering of DNA samples from individuals convicted of certain offenses after January 1, 1996.  *See* 1994 N.Y. Laws, ch. 737, §§ 1,3; *see also Nicholas v. Goord,* 430 F.3d 652, 654 n.1 (2d Cir. 2005).  In 1999 that provision was amended to apply to any person convicted of certain prescribed offenses, including murder, prior to the statute's effective date, provided that at the time of amendment he or she was still serving a prison sentence imposed in connection with the earlier offense.  1999 N.Y. Laws, ch 560, § 9; *see Nicholas*, 430 F.3d at 654 n.1.

Since its enactment New York's DNA indexing provision, like similar provisions from other jurisdictions, has withstood various challenges, including to its constitutionality.  *See, e.g., United States v. Amerson*, 483 F.3d 73, 75 (2d Cir. 2007); *Nicholas*, 430 F.3d at 672.  In response to one such challenge, the Second Circuit has held that the DNA indexing provision is lawful, concluding that special needs of the state giving rise to enactment of the statute trump the relatively minimal privacy interests and intrusion associated with a DNA sampling requirement.  *Nicholas,* 430 F.3d at 671-72; *see also Roe v. Marcotte,* 193 F.3d 72, 78-80 (2d Cir. 1999) (upholding a Connecticut DNA indexing statute substantially similar

16

to New York's DNA provisions).

The basis for plaintiff's challenge in this case to the constitutionality of the DNA collection requirement is not entirely clear from his amended complaint and motion opposition papers.  This uncertainty is of no moment, however, since the validity of New York's DNA indexing statute has been upheld by courts, including in this circuit, "over almost every conceivable constitutional challenge."  *Jackson v. Ricks,* No. 9:02-CV-00773, 2006 WL 2023570, at *23 (N.D.N.Y. July 18, 2006) (Sharpe, D.J. and Lowe, M.J.) (collecting cases); *see also Doe v. Moore,* 410 F.3d 1337, 1349-50 (11th Cir. 2005) (upholding Florida's sex offender DNA collection statute in the face of equal protection and due process challenges).

In challenging New York's DNA enactment plaintiff appears to be crafting an argument which is based upon alleged non-compliance with its statutory empowering provisions, under which the Division of Criminal Justice Services ("DCJS") is tasked with establishing the required notification procedures.  That argument, however, appears to present questions of compliance with state law and regulation which are not cognizable under section 1983.  *See Pollnow v. Glennon*, 757 F.2d 496,

17

501 (2d Cir. 1985).

Regardless of the nature of his challenge to New York's indexing provision, Amaker is now precluded from pursuing that claim by virtue of a prior decision from this court addressing a similar challenge by him. Among the claims which he raised in *Amaker II* were those addressed to the efforts of DOCS employees, including corrections officials at Upstate, to collect a DNA sample from him. Plaintiff's challenge in that action to the constitutionality of New York's DNA indexing provisions was resolved against him based upon the issuance on November 30, 2007 of a report and recommendation by United States Magistrate Judge David R. Homer, and approval of that report, in pertinent part, by Chief Judge Norman A. Mordue on July 10, 2008. *See Amaker II,* Dkt. Nos. 160, 167.

Since the arguments now asserted in connection with the DNA challenge were or could have been raised by Amaker in his prior action, he is precluded from now relitigating those claims. *See Akhenaten v. Najee*, *LLC*, 544 F. Supp. 2d 320, 327-28 (S.D.N.Y. 2008). Accordingly, the portion of plaintiff's amended complaint which challenges the testing requirements under the DNA identification indexing law lacks merit, and is subject to dismissal.

18

C.     The Torture Victim Protection Act of 1991

Among the claims set forth in plaintiff's complaint, as amended, is a cause of action under the Torture Victim Protection Act of 1991, (the "TVPA"), Pub. L. No. 102-256, 106 S. Stat. 73 (1992), based upon defendants' actions toward him.  Amended Complaint (Dkt. No. 78) ¶¶ 28, 34, 36.  In their motion, defendants also seek summary dismissal of this claim, as a matter of law.

The TVPA provides, in relevant part, that

> [a]n individual who, under actual or apparent authority, or color of law, *of any foreign nation* (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; . . .

Pub. L. No. 105-256, § 2(a), 106 Stat. at 73 (emphasis added).  As can be seen, by its express terms the TVPA applies only to those who act under the authority of a foreign nation.  *See In re: Agent Orange Product Liability Litig.,* 373 F. Supp. 2d 7, 110-13 (E.D.N.Y. 2005); *see also Arar v. Ashcroft*, 414 F. Supp. 2d 250, 264 (E.D.N.Y. 2006), *aff'd*, 532 F.3d 157 (2d Cir. 2008).  Since Amaker plainly cannot meet this requirement, his cause of action under the TVPA is deficient as a matter of law, and thus subject to dismissal.

D.     Property Loss

Although the portion of his complaint in which he summarizes his claims does not reference such a cause of action, elsewhere in that pleading Amaker alleges that certain of his property was withheld by defendants Perry and Baniler, and later destroyed by defendant LaClair.[10] Amended Complaint (Dkt. No. 78) ¶ 21.  Defendants also seek dismissal of this potential claim as being without merit.

It is well-settled that no constitutionally cognizable cause of action exists for the destruction or loss of a prison inmate's property, provided that an adequate remedy is afforded by the state courts for such deprivation.  *Griffin v. Komenecky*, No. 95-CV-796, 1997 WL 204313, at *2 (N.D.N.Y. Apr. 14, 1997) (Scullin, J.).  In this instance, plaintiff was entitled to avail himself of the mechanism prescribed under section nine of the New York Court of Claims Act to redress his loss of property claim.  *See id.*; *see also Brooks v. Chappius*, 450 F. Supp. 2d 220, 226-27 (W.D.N.Y. 2006).  Accordingly, plaintiff's loss of property cause of action

---

[10]     To some extent there is overlap between plaintiff's property loss claims and his contention that through confiscation or destruction of documents and other materials related to his ongoing litigation, he has been deprived of access to the courts.  The property loss at issue in connection with this claim could also potentially serve as adverse action alleged by the plaintiff in connection with his retaliation claim.  Both of these claims are addressed elsewhere in this report.  *See* pp. 21-26, and 42-48, *post.*

is without merit, and subject to dismissal as a matter of law.  *See Brooks*, 450 F. Supp. 2d at 227.

> E.   Eleventh Amendment/Sovereign Immunity

Plaintiff's claims in this action are brought against the various named defendants, both as individuals and in their official capacities. *See, e.g.,* Amended Complaint (Dkt. No. 78) ¶ 1.  Noting that plaintiff's claims against the defendants in their official capacities are tantamount to those against the State, defendants seek their dismissal.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought.  *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978).  This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[11]

*Richards v. State of New York Appellate Division, Second Dep't*, 597 F.

---

[11]   In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State.  As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment.  *Northern Ins. Co. of New York v. Chatham County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91, 102 S. Ct. 2325, 2328-29 (1982)).  "To the extent that a state official is sued for damages in his official capacity . . . the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."[12] *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991); *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105 (1985).

Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal.  *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.).  I therefore recommend that this portion of defendants' motion be granted, and that plaintiff's damage claim against the defendants in their capacities as state officials be dismissed.

## F.    Plaintiff's Court Access Claims

Scattered intermittently throughout plaintiff's complaint are allegations that through their actions defendants denied him access to the

---

[12]    By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983.  *See Hafer*, 502 U.S. at 30-31, 112 S. Ct. at 364-65.

22

courts, in violation of his rights under the First Amendment.  Plaintiff's

court access denial claims are based principally upon his contention that

prison law library facilities available to him were inadequate, and

additionally that through their actions corrections workers precluded him

from accessing those materials.  *See* Amended Complaint (Dkt. No. 78)

¶¶ 7, 16, 32.  Defendants seek dismissal of those claims based principally

upon plaintiff's failure to demonstrate the existence of any injury or

prejudice experienced as a result of their actions.

An inmate's constitutional right to "meaningful" access to the courts

is well-recognized and firmly established.  *Bounds v. Smith*, 430 U.S. 817,

823, 97 S. Ct. 1491, 1495 (1977) (citations and internal quotation marks

omitted).  Although in *Bounds* the Supreme Court held that this right of

access requires prison authorities "to assist inmates in the preparation

and filing of meaningful legal papers by providing prisoners with adequate

law libraries or adequate assistance from persons trained in the law[,]" *id.*

at 828, 97 S. Ct. at 1498, the Court later clarified that

> prison law libraries and legal assistance programs are not
> ends in themselves, but only the means for ensuring a
> reasonably adequate opportunity to present claimed violations
> of fundamental constitutional rights to the courts.  Because
> *Bounds* did not create an abstract, freestanding right to a law
> library or legal assistance, an inmate cannot establish relevant

> actual injury simply by establishing that his prison's law library
> or legal assistance program is subpar in some theoretical
> sense.

*Lewis v. Casey*, 518 U.S. 343, 351, 116 S. Ct. 2174, 2180 (1996) (internal

quotations and citations omitted).  Instead, an inmate "must go one step

further and demonstrate that the alleged shortcomings in the library or

legal assistance program hindered his efforts to pursue a legal claim."  *Id.*

In other words, to establish a violation of the right of access to the courts,

a plaintiff must demonstrate that defendants' interference caused him or

her actual injury – that is, that a "nonfrivolous legal claim had been

frustrated or was being impeded" as a result of defendants' conduct.[13]  *Id.*

at 353, 116 S. Ct. at 2181.

    In support of his court access claim plaintiff maintains that he was

---

[13]     Among the court access arguments asserted by plaintiff is the claim that on one occasion on September 10, 1998 plaintiff gave legal mail of an unspecified nature to Corrections Officer R. Lincoln, who never delivered it.  Amended Complaint (Dkt. No. 78) ¶ 7.  Since neither plaintiff's complaint nor the record now before the court discloses, however, that plaintiff suffered any prejudice as a result of that failure, this claim lacks merit.  *See Govan v. Campbell*, 289 F. Supp. 2d 289, 297-98 (N.D.N.Y. 2003) (Sharpe, M.J.).  Moreover, to the extent that the failure to promptly deliver that mail might be proven to have legal consequences, it is noted that that significance is substantially ameliorated by the prison mailbox rule which provides, in essence, that court papers are deemed filed when delivered by a prison inmate to corrections officials.  *See Houston v. Lack*, 487 U.S. 266, 270-72, 108 S. Ct. 2379, 2382-83 (1988); *Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *3 (S.D.N.Y. Feb. 20, 2004).

denied law library access between January 2, 2001 and January 18, 2001,

and again from the filing of a second grievance related to library access

on February 26, 2001 until March 5, 2001.  Amended Complaint (Dkt. No.

78) ¶ 16.  Plaintiff contends that this lack of access effectively precluded

him from filing a motion to compel – presumably related to discovery – in a

pending federal court action.[14]  *Id.*

Plaintiff's library access claims are addressed in a declaration given

by Michael McKinnon, the DOCS employee charged with oversight of the

law library at Clinton.  *See* McKinnon Decl. (Dkt. No. 229-4) ¶¶ 1-2.  In

that declaration McKinnon describes the law library facilities and

procedures at Clinton, including the established protocol for requesting

library access.  *Id.* ¶¶ 2-3.  McKinnon notes that despite plaintiff's

allegations to the contrary, *see* Amended Complaint (Dkt. No. 78) ¶ 7, he

never denied library services to the plaintiff or any other inmate when

faced with a court imposed deadline.  *Id.* ¶ 6.  McKinnon also notes that

over the four month period during which the plaintiff could have

---

[14]      As defendants note, many of plaintiff's allegations regarding library
access denial fail to identify any particular defendant to whom the denial can be fairly
attributed.  Since personal involvement in a constitutional deprivation is an essential
requirement of a civil rights claim under 42 U.S.C. § 1983, *Colon v. Coughlin*, 58 F.3d
865, 873 (2d Cir. 1995), this failure thus provides an additional, independent basis for
dismissal of at least portions of plaintiff's court access claims.

commenced a proceeding under New York Civil Practice Law and Rules Article 78 to challenge the disciplinary action initiated in June of 1998, one of the potential legal proceedings for which he could have requested access to library facilities, he was granted library access on seven occasions during July, eleven times in August, five times in September and on six occasions in October of 1998, and that in the following months he was permitted use of the library facilities on approximately ten days in November of 1998 and nine times in December of that year. *Id.* ¶ 6. According to that declaration, records at Clinton also show that between June of 1999 and September, 2001, plaintiff was scheduled for more than four hundred library call outs, and was granted special access status on February 24, 2001 in light of an impending March 26, 2001 court deadline. *Id.* ¶ 9.

The existence of prejudice is an essential element of a First Amendment court access denial claim. *Lewis*, 518 U.S. at 353, 116 S. Ct. at 2181. It is true that in his amended complaint plaintiff does claim, although in general and conclusory terms, that he was prejudiced by defendants' actions, allegedly having missed a court ordered deadline on more than one occasion, causing adverse consequences in connection

26

with his legal actions.  *See, e.g.,* Amended Complaint (Dkt. No. 78) ¶¶ 16,

32.  Faced with defendants' motion raising lack of prejudice, however,

plaintiff has failed to offer any specifics regarding those claims and to

adduce proof from which a reasonable factfinder could conclude that he

did indeed experience prejudice by virtue of defendants' failure to provide

him with library access, and to mail court documents, leaving instead only

his conclusory allegations without underlying evidentiary support.

In sum, the record now before the court neither supports plaintiff's

claim that he was denied access to adequate library facilities while at

Clinton, nor does it establish the existence of prejudice suffered as a

result of any such deprivation, if indeed it did occur.  Accordingly, I

recommend dismissal of plaintiff's court access claims as a matter of law.

G.    Plaintiff's RICO Cause of Action

In broad and conclusory terms devoid of specifics, plaintiff alleges

that various of the defendants named in the action have violated the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

§ 1961 *et seq.*  Amended Complaint (Dkt. No. 78) ¶¶ 26, 35.  Plaintiff's

RICO claim appears to be predicated upon an alleged mail fraud scheme

engaged in by corrections workers and "approved by Comm. Goord, Supt.

Senkowski" to steal inmate mail, and includes his request that the court refer the matter to the United States Attorney for prosecution. *Id.* at ¶¶ 26, 35, 39.  Interpreting plaintiff's complaint as seeking criminal prosecution for the alleged violation, and noting that the prerequisite for establishing a claim under that provision cannot be met in this instance, defendants seek dismissal of plaintiff's RICO claim.  Despite his submission of comprehensive materials in opposition to defendants' motion, including a thirty-eight page affidavit and a twenty-one page memorandum of law, plaintiff does not address this portion of defendants' motion.

The substantive prohibitions under RICO are set forth principally in 18 U.S.C. § 1962(a)-(c); subdivision (d) of that provision prohibits parties from conspiring to violate one or more of those substantive provisions.  In relevant part, section 1962 provides that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c); *see Salinas v. United States*, 522 U.S. 52, 62, 118 S.

Ct. 469, 476 (1997).

In addition to providing for potential criminal prosecution, RICO also affords a civil right of action for violation of its provisions, authorizing recovery of treble damages as well as costs of the action, including reasonable attorneys' fees, in the event of an established violation 18 U.S.C. § 1964(c).  *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 183, 117 S. Ct. 1984, 1987-88 (1997). To plead a cognizable civil RICO claim, a party must allege "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity," as well as "injury to business or property as a result of the RICO violation."  *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999).

The pleading of a civil RICO violation is subject to the heightened requirement that its supporting allegations must be pleaded with particularity.  *See* Fed.R.Civ.P. 9(b); *see also Anatian*, 193 F.3d at 88-89. Additionally, the court's local rules require that when a civil RICO claim is asserted before this court, a RICO statement containing certain specified information must be filed by the party raising the claim.  N.D.N.Y.L.R. 9.2. A review of the record in this case reveals that neither of these critical requirements has been met, thereby providing a threshold basis for

29

dismissal of plaintiff's RICO claim.  *See Spoto v. Herkimer County Trust*, No. 99-CV-1476, 2000 WL 533293, at *3 n.2 (N.D.N.Y. Apr. 27, 2000) (Munson, J.).

Turning to the merits, it is clear that the record falls considerably short of establishing a basis upon which a reasonable factfinder could conclude that the requisite elements of a RICO claim have been established.  While plaintiff alleges in conclusory fashion the existence of mail fraud at the prison facilities in which he was housed, and mail fraud potentially qualifies as racketeering activity, *see Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 454, 125 S. Ct. 1991, 1995 (2006), the record fails to disclose the existence of a conspiracy of two or more persons, lacks evidence of two or more acts constituting a pattern of racketeering activity, does not identify the relevant "enterprise", fails to demonstrate how the conspirators, through the pattern of racketeering activity, conducted the enterprise, and alleges no injury to business or property resulting from defendants' actions.  *See* Amended Complaint (Dkt. No. 78) ¶¶ 26, 35.  Since the record fails to disclose evidence from which a reasonable factfinder in this case could conclude that the requisite elements to sustain a civil RICO claim have been met, I

recommend dismissal of that cause of action on the merits.[15]

H.    Deliberate Medical Indifference

One of the central themes presented in plaintiff's prolix, narrative-styled amended complaint is his claim that certain of the defendants have failed to properly treat his various medical conditions, many of which are not specified with any degree of particularity.  Defendants contend that based upon the record now before the court they are entitled to dismissal of that claim as a matter of law, arguing that plaintiff neither suffers from a serious medical need, nor were the named defendants subjectively and deliberately indifferent to any such need.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084

---

[15]    In light of this finding I also recommend against referral of this matter to the United States Attorney, a matter which, while within the court's inherent authority in the event of a perceived criminal violation, *see, e.g., ACLI Govn't Sec., Inc. v. Rhoades*, 989 F. Supp. 462, 467 (S.D.N.Y. 1997), does not appear to be warranted. This determination, of course, does not preclude the plaintiff from filing a complaint with the United States Attorney or other appropriate federal authorities.

(1986) (citing, *inter alia*, *Estelle*).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference."  *See Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson*, 501 U.S. 294, 111 S. Ct. 2321.  Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S.

Ct. at 1978; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, "'sufficiently serious'". *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citing *Wilson*, 501 U.S. at 298, 111 S. Ct. at 2324), *cert. denied sub nom.*, *Foote v. Hathaway*, 513 U.S. 1154, 115 S. Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted). A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'"; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting, *inter alia*, *Chance*). Relevant factors in making this determination include injury that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or causes

33

"'chronic and substantial pain.'"  *Chance*, 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County*, No. CIV. 9:00CV774, 2002 WL 31309244, at *2-3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.).

Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).  It is well-established, however, that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment.  *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 201-02; *Chance*, 143 F.3d at 703; *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040, 113 S. Ct. 828 (1992).  The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to

provide to their patients.  *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293;

*Chance*, 143 F.3d at 703; *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264

(W.D.N.Y. 1998).

Plaintiff's medical indifference claims, while referenced elsewhere,

are summarized in paragraph twenty-seven of his amended complaint,

and augmented in considerably greater detail in his summary judgment

submissions including, notably, his affidavit.  Plaintiff's medical concerns

appear to center upon disagreement over the course of defendants'

treatment of his diminished eyesight; chronic back pain, diagnosed as

degenerative disc disease; and pain, "clicking and popping" in his knee.

Amended Complaint (Dkt. No. 78) ¶¶ 12, 27.  Generally speaking,

plaintiff's medical indifference claim recites a litany of instances in which

plaintiff did not receive desired medication, medical equipment, physical

therapy, or treatment for his conditions.[16]  *See* Amended Complaint (Dkt.

No. 78) ¶ 27.

1.    Serious Medical Needs

In their motion, defendants maintain that none of the conditions

upon which plaintiff's medical indifference claims are predicated rise to a

---

[16]    From a comparison of plaintiff's medical indifference claims in this case
with those rejected in *Amaker II,* it appears that there is considerable overlap.

level of constitutional significance.  In *Amaker II* the court found that

plaintiff's claims regarding his vision and delay in eye treatment did not

establish the existence of a serious medical need or injury.  *See* Report

and Recommendation in *Amaker II* (Dkt. No. 160) at pp. 15-16 and

Memorandum-Decision and Order (Dkt. No. 167) at pp. 3, 6.  Similarly, the

*Amaker II* court concluded that in complaining regarding the treatment of

his knee, including denial of magnetic resonance imaging ("MRI") testing

and knee braces, plaintiff also failed to make the threshold requirement of

establishing a serious physical injury or need.  *Id*. at 16-17.  Likewise,

while noting a division among the courts regarding this issue, the court in

that case nonetheless concluded that plaintiff's claim of abdominal pain,

as drafted, did not successfully present a material issue of fact regarding

serious medical need.  *Id.* at 17.

　　　Having carefully reviewed the record now presented, like the court in

*Amaker II* I doubt plaintiff's ability to establish, at trial, the existence of a

serious medical condition of constitutional significance to which the

defendants were deliberately indifferent.  Because I find that Amaker

cannot establish indifference on the part of defendants to any of his

medical needs, regardless of whether they were sufficiently serious to

trigger protections of the Eighth Amendment, and defendants do not appear to press the issue, I nonetheless find it unnecessary to address the sufficiency of plaintiff's allegations in this regard.

### 2.   Deliberate Indifference

Turning to the subjective element of the deliberate indifference inquiry I find, as did the court in *Amaker II*, that rather than disclosing any indifference on the part of prison medical officials to plaintiff's medical needs, the record instead reflects a comprehensive and at times intense pattern of treatment for plaintiff's various medical conditions which, though plainly not to his complete liking, easily fulfills constitutionally mandated minimal requirements.

Plaintiff's medical indifference claim appears to relate to treatment received at both of the correctional facilities at issue in this case, although the vast majority of those allegations relate to his complaints regarding medical attention received while at Clinton.  To the extent that plaintiff's claims involve the sufficiency of medical treatment administered at Upstate, similar claims were carefully reviewed by the court in *Amaker II*, resulting in a finding that the defendants were not deliberately indifferent to his serious medical needs during the time of his incarceration at

37

Upstate.  *See* Report and Recommendation in *Amaker II* (Dkt. No. 160) at pp. 15-17.  That determination is dispositive of the portion of plaintiff's medical indifference claim in this action related to his medical care at Upstate.[17]  *See Akhenaten*, 544 F. Supp. 2d at 327-28.

Turning to plaintiff's medical treatment while at Clinton, medical records of plaintiff's care at that facility reflect that between June 8, 1999 and December 1, 1999 – the period covered by his complaints regarding medical care at Clinton – he was seen on approximately one hundred occasions regarding complaints concerning his back, knee, and neck pain, chronic headaches, and various other symptoms by an array of health care providers which included prison doctors, outside specialists, physician assistants, therapists and nurses.  *See* Mans Aff. (Dkt. No. 229-

---

[17]    Plaintiff's medical indifference claims carry forward to his time at Upstate, following a transfer into that facility on October 31, 2001.  In his complaint, as amended, plaintiff asserts that during the course of that transfer he was "made to walk in waist chain hurting his herniated discs in his lower back causing his legs to go numbed [sic] [and that he] never was send [sic] to a medical doctor ...."  Amended Complaint (Dkt. No. 78) ¶¶ 21, 24.  This claim is contradicted by plaintiff's medical records, however, which reveal that upon his arrival at Upstate he was medically examined, screened and orientated, with no indication of any complaints of pain or numbness at that time; in fact, according to his medical records, plaintiff denied having any injury or current medical complaint when questioned during that process.  *See* Mans Aff. (Dkt. No. 229-14) Exh. A, 10/31/08 Entrance Exam Form, Screening and Physical Assessment Form, Inmate Orientation Form, and Incoming Draft Form.  Despite plaintiff's further claim that he was not seen by medical officials at Upstate, the records once again reveal otherwise, reflecting that prior to the time of his transfer out of that facility on April 22, 2002, he was seen by medical personnel at Upstate more than forty times, with various complaints being registered by him along the way.

14) Exh. A (filed under seal); *see also* Johnson Decl. (Dkt. No. 229-3) ¶ 7.

During that time plaintiff was provided with medical examinations,

consultations, physical therapy, knee braces and supports, and various

medications, and additionally was the subject of x-rays and magnetic

resonance imaging ("MRI") testing. *Id.*

One of the conditions of which plaintiff complains relates to chronic

back pain.  Plaintiff's medical records reveal that he has been diagnosed

as suffering from degenerative disc disease.  Mans Aff. (Dkt. No. 229-14)

Exh. A; *see also* Johnson Decl. (Dkt. No. 229-3) ¶ 7.  According to Dr.

Vonda Johnson, the Medical Director at Clinton, while certain treatment

regimens may afford some measure of relief for that condition, depending

upon the particular patient, it cannot necessarily be "fixed" through

surgery, medication, or physical therapy.  Johnson Decl. (Dkt. No. 229-3)

¶ 9.  In any event, plaintiff's health records reveal that plaintiff was

provided considerable testing and treatment, including physical therapy, in

an effort to address that condition.  *See generally* Mans Aff. (Dkt. No. 229-

14) Exh. A; Johnson Decl. (Dkt. No. 229-3) ¶ 11.  Evaluations arranged by

prison officials regarding plaintiff's back condition have included MRI

testing as well as an EMG study/nerve conduction study on November 1,

1999, ordered by Dr. Ellen.  Johnson Decl. (Dkt. No. 229-3) ¶ 11.

Another of plaintiff's complaints relates to treatment received for his knee.  Plaintiff's medical records reveal that a bilateral physical examination of Amaker's knees was conducted on November 15, 1999 by Dr. Ellen.  Manns Aff. (Dkt. No. 229-14) Exh. A, 11/1/99, 11/8/99, 11/15/99 Entries; Johnson Decl. (Dkt. No. 229-3) ¶ 11.  Neither the results of Dr. Ellen's examination nor anything contained in plaintiff's records was viewed as indicating the need to perform MRI testing on his knees.  *Id*.

The specifics of plaintiff's complaints regarding his knee condition include allegations that prison medical personnel failed to provide him with proper knee braces, failed to order MRI testing, and denied his requests to see a specialist to address the pain, clicking and popping being experienced in both knees.  Plaintiff's conclusory allegations of not being provided with a knee brace are belied by the record.  On April 13, 1999 one neoprene right knee brace was received at the facility for the plaintiff, with an indication that the other was back-ordered.  *See* Mans Aff. (Dkt. No. 229-14) Exh. A, 4/13/99 entry.  In any event upon receipt of the special neoprene knee braces, they were refused by the plaintiff.  *Id*., 1/6/00 Interdepartmental Communication.

40

Plaintiff's medical records reflect that medical officials at Clinton were in fact fully cognizant of plaintiff's complaints regarding knee pain, and took measures to address that condition.  On November 8, 1999 a neurological examination of plaintiff's lower extremities was conducted, followed by a physical examination of both of plaintiff's knees on November 15, 1999.  Johnson Decl. (Dkt. No. 229-3) ¶ 11; Mans Aff. (Dkt. No. 229-14) Exh. A, 11/1/99, 11/8/99, 11/15/99 entries.  The results of those examinations by Dr. Ellen revealed nothing to indicate the need for MRI testing.  While plaintiff challenges this determination, unsupported by any evidence suggesting that the opinions of Dr. Ellen were not medically appropriate, his claim in this regard represents nothing more than disagreement over a chosen course of treatment, and is insufficient to support a claim of indifference.  *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 201-02; *Chance*, 143 F.3d at 703; *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.3d 296 (2d Cir.), *cert. denied*, 506 U.S. 1040, 113 S. Ct. 828 (1992).

Another of plaintiff's medical complaints stems from the claim that while at Clinton he was denied treatment by Dr. Lee for a period of three months.  Amended Complaint (Dkt. No. 78) ¶ 8.  Neither plaintiff's

41

complaint nor his motion submission, however, contains specifics regarding the time period involved.  Moreover, while there may well have been periods of such a duration over which he was not seen by a doctor, a review of plaintiff's medical records fails to disclose any three month interval during which he was not medically treated by any DOCS medical personnel at Clinton.  *See* Mans Aff. (Dkt. No. 229-14) Exh. A.   Despite plaintiff's apparent belief to the contrary, the Eighth Amendment does not guarantee a prison inmate unfettered access to a prison physician at his or her insistence.  *See Harrison v. Barkley*, 219 F.3d 132, 142 (2d Cir. 2000) ("'[S]ociety does not expect that prisoners will have unqualified access to health care . . . .'") (quoting *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995 (1992)).

The vast majority of plaintiff's medical complaints surround the belief that he was not provided with adequate physical therapy, his disagreement over being told that he would have to pay for replacement of his broken eyeglasses, and the denial of appropriate shower and gym passes.[18]  These complaints fall well short of establishing deliberate

---

[18]      According to his health records, plaintiff was seen at Clinton by Nurse Rizoff on June 16, 1998, claiming that his eyeglasses were broken and requesting an eye examination and new glasses.  *See* Mans Aff. (Dkt. No. 229-14) Exh. A, 6/16/98. Nurse Rizoff inquired as to how the glasses were broken, and advised the plaintiff that

medical indifference of constitutional proportions on the part of prison

officials at Clinton and Upstate.  As the Second Circuit has noted,

> [i]t must be remembered that the State is not
> constitutionally obligated, much as it may be
> desired by inmates, to construct a perfect plan for
> [medical] care that exceeds what the average
> reasonable person would expect or avail herself of
> in life outside the prison walls. [A] correctional
> facility is not a health spa, but a prison in which
> convicted felons are incarcerated. Common
> experience indicates that the great majority of . . .
> prisoners would not in freedom or on parole enjoy
> the excellence in [medical] care which the plaintiffs
> understandably seek . . . . We are governed by the
> principle that the objective is not to impose upon a
> state prison a model system of [medical] care
> beyond average needs but to provide the minimum
> level of [medical] care required by the Constitution.
> The Constitution does not command that inmates
> be given the kind of medical attention that judges
> would wish to have for themselves....  The
> essential test is one of medical necessity and not

_____

pursuant to the DOCS health services policy regarding vision care services he might
be held accountable for the cost of any replacement that occurred within two years of
his last eye examination and the issuance of glasses.  *See id.*, Interdepartmental
Communications from Dr. Lee to Plaintiff Regarding DOCS Policy for Eyeglasses,
dated February 26, 1999.  Plaintiff's records reveal that his eyes were subsequently
examined on July 8, 1998, at which time he received a pair of glasses, and that he was
retested on April 26, 1999 after complaining of eye pain.  *See Id.*, 7/9/98 and 4/26/99
Entries.  While there is considerable question as to whether plaintiff's eye condition
constitutes a serious medical need for purposes of the Eight Amendment, particularly
in view of the lack of allegations that his condition degenerated or he experienced
severe pain as a result of the delay in providing him with an eye examination and
glasses, *see Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996); *Abdush-Shahid v.
Coughlin*, 933 F. Supp. 168, 181 (N.D.N.Y. 1996) (Koeltl, J.), it is clear that the
defendants were not, as alleged, indifferent to his vision impairment.

one simply of desirability.

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir. 1986) (internal quotations and citations omitted).

Plaintiff's ambulatory health record, which is both extensive and comprehensive, has been reviewed by Dr. Vonda Johnson, the Medical Director at Clinton.  Based upon her professional judgment, Dr. Johnson opines that the plaintiff neither suffered from any acute medical condition requiring immediate medical care and treatment or which resulted in harm to his health or well-being, nor was he denied appropriate treatment by medical and nursing staff both at Clinton and Upstate, as well as by any outside specialists required under the circumstances.  Johnson Decl. (Dkt. No. 299-3) ¶¶ 14-15.  Having engaged in a careful review of plaintiff's medical records, informed by plaintiff's arguments as well as Dr. Johnson's opinions, I am of the view that no reasonable factfinder could conclude that defendants were deliberately indifferent to any serious medical condition suffered by the plaintiff, and therefore recommend dismissal of plaintiff's deliberate indifference claims as a matter of law.

I.    Retaliation

In his amended complaint, although with the same degree of

44

indefiniteness that has plagued his submissions in other substantive areas,  plaintiff also asserts claims of violation of his First Amendment rights based upon retaliation for having engaged in protected activity, including the filing of grievances.  Defendants also seek dismissal of plaintiff's retaliation claim as fatally nebulous and unsupported.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies.  *See Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care."  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (same).

In order to state a *prima facie* claim under section 1983 for

retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes*, 239 F.3d at 492 (2d Cir. 2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy*, 429 U.S. at 287, 97 S. Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link

the two.  When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims.  *Flaherty*, 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983.  *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).   As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation.  *See Abascal v. Hilton*, No. 04-CV-1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

Analysis of plaintiff's retaliation cause of action is complicated by virtue of his failure in most instances to state, with any modicum of clarity, what specific protected activity triggered the retaliatory response and what the resulting adverse action was, including to articulate the timeframe involved.  Among the actions apparently attributed by Amaker to retaliatory animus are searches of his cell, conducted on March 22 and 23, 1999.  Amended Complaint (Dkt. No. 78) ¶ 10.  Defendants' submissions, however, reveal that the first of those two searches was based upon suspicion that the plaintiff, one of several inmates present in the law library at the time a corrections officer's handcuff key case was discovered missing, could be in possession of that contraband.[19]  Bell Decl. (Dkt. No. 229-10) ¶ 6.  The second of those searches was a routine search performed in accordance with DOCS directives requiring periodic random cell searches.  Id. ¶¶ 6-8.  Since it therefore appears that both of those actions were taken for independent and legitimate reasons, they

---

[19]        It is well-established that as a prison inmate plaintiff has no Fourth Amendment right to privacy which would preclude a search of his cell, accomplished for legitimate reasons.  *Hudson v. Palmer*, 468 U.S. 517, 525-26, 104 S. Ct. 3194, 3200 (1984).  A cell search motivated out of retaliatory animus, however, could be found to support a claim of unlawful retaliation provided that all of the prerequisites for establishing a First Amendment claim were met.  *See H'Shaka v. Drown*, No. 9:03-CV-937, 2007 WL 1017275, at *12 (N.D.N.y. Mar. 30, 2007) (Kahn, D.J. and Treece, M.J.).

cannot form the basis of a retaliation claim.  *Mount Healthy City Bd. of Ed.,* 429 U.S. at 287, 97 S. Ct. at 576; *see also Lowrence v. Achtyl,* 20 F.3d 529, 535 (2d Cir. 1994).

Although it is far from clear, plaintiff also appears to assert that the requirement imposed by prison officials that he pay for spices and food consumed in connection with his celebration of Ramadan was retaliatory. Amended Complaint (Dkt. No. 78) ¶ 13.  It is doubtful that a reasonable factfinder could conclude that this requirement rose to a level sufficient to constitute an adverse action.  *Cf. Kole v. Lappin*, 551 F. Supp. 2d 149, 155 (D. Conn. 2008) (dismissing plaintiff's retaliation claim based on her complaint that the prison reduced the number of items sold as kosher-for Passover for inmates in response to her filing a grievance regarding the one hundred dollar spending limit).  In any event, more importantly, there is no evidence among any of plaintiff's submissions which would establish the requisite nexus between the imposition of that requirement and plaintiff having engaged in protected activity.

Undeniably, it appears that the plaintiff in this case frequently avails himself of his First Amendment right to complain, by instituting litigation, filing grievances, and pursuing other channels, regarding prison conditions

and his treatment as a DOCS inmate.  It is also clear that the plaintiff has been subject to disciplinary action by prison officials with some regularity. While these two circumstances could suffice to establish two of the three requisite elements to establish a claim of unlawful retaliation, at least at the summary judgment stage, the record is wholly lacking in evidence from which a reasonable factfinder could conclude that the third and critical element, linking one or more of the adverse actions to plaintiff's protected activity, has been satisfied.  Accordingly, I recommend dismissal of plaintiff's retaliation claim as a matter of law.

> J.    Equal Protection

Plaintiff's complaint, as amended, also makes passing reference to the denial by defendants of his right to equal protection.  *See, e.g.,* Amended Complaint (Dkt. No. 78) ¶ 28, 33.

The Equal Protection Clause directs state actors to treat similarly situated people alike.  *See City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985).  To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or

suspect class.  *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d

Cir.1995) (citing, *inter alia*, *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.

Ct. 1756, 1767 (1987)).  The plaintiff must also show that the disparity in

treatment "cannot survive the appropriate level of scrutiny which, in the

prison setting, means that he must demonstrate that his treatment was not

reasonably related to [any] legitimate penological interests."  *Phillips v.

Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (quoting *Shaw v. Murphy*, 532

U.S. 223, 225, 121 S. Ct. 1475 (2001) (internal quotation marks omitted)).

In this instance neither plaintiff's complaint, as amended, nor the

record now before the court provides specifics to flesh out plaintiff's equal

protection claim.  Presumably, the claim is rooted in the alleged

differentiation of prison officials in their treatment of him, based upon his

race.  To be sure, plaintiff's submissions indicate the use of at least one

racial epithet by prison officials.  The record, however, is otherwise devoid

of evidence from which a reasonable factfinder could conclude that the

defendants discriminated as against the plaintiff based upon his race or

some other protected criteria.  Instead, plaintiff's allegations fall within the

category of those observed by the Second Circuit to be insufficient, the

court noting that "complaints relying on the civil rights statutes are

insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning."  *Barr v. Abrahams,* 810 F.2d 358, 363 (2d Cir. 1987).  Discerning no basis upon which a reasonable factfinder could conclude that the defendants have violated Amaker's right to equal protection under the Fourteenth Amendment, I similarly recommend dismissal of that claim.

K.    Procedural Due Process

Plaintiff's amended complaint also asserts, once again in wholly conclusory fashion, that his right to due process was violated by the defendants.  Conspicuously absent from plaintiff's submissions, however, is an indication of what cognizable liberty interests are implicated in this cause of action, as well as illumination as to the reasons for his claim that due process was not afforded.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted);

*Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).  The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well- established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S. Ct. 2963, 2978-80 (1974).  Under *Wolff*, the constitutionally mandated due process requirements, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense.  *Wolff*, 418 U.S. at 564-67, 94 S. Ct. at 2978-80; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988).  In order to pass muster under the Fourteenth Amendment, hearing officer's disciplinary determination must garner the support of at least "some evidence".  *Superintendent v. Hill*, 472 U.S. 445, 105 S. Ct. 2768 (1985).

Having carefully searched the record now before the court, I am unable to find that Amaker experienced the deprivation of a

53

constitutionally cognizable liberty interest sufficient to trigger the

protections afforded under the Fourteenth Amendment.  Moreover, even

assuming *arguendo* the existence of such a liberty interest, plaintiff's

submissions do not disclose any failure to comply with the constitutional

mandates of the Fourteenth Amendment, including those articulated by

the Supreme Court in *Wolff.*  Accordingly, I recommend dismissal of

plaintiff's procedural due process cause of action, as a matter of law.

IV.    SUMMARY AND RECOMMENDATION

        Plaintiff's amended complaint, though rambling and consisting of

varied and wide-ranging claims based upon acts allegedly occurring at

both Clinton and Upstate, when boiled down to its essence asserts claims

of medical indifference, constitutional violations based on DNA testing,

retaliation, and denial of access to the courts.  Having carefully

considered the record now before the court I conclude that no factfinder

could find in plaintiff's favor on any of these claims, and that defendants

are thus entitled to dismissal of all claims against them, as a matter of

law.[20]  Accordingly, it is hereby

---

[20]    Based upon this finding I have opted not to address the defendants'
additional arguments of lack of personal involvement and entitlement to qualified
immunity.  *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001).  Similarly, I have
chosen not to address the motion filed on behalf of defendant R. Rivera seeking

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 229) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety; and it is further hereby

RECOMMENDED that in light of this disposition the motion of defendant R. Rivera to dismiss plaintiff's claims against him for failure to state a cause of action upon which relief may be granted (Dkt. No. 237) be DENIED as moot.

NOTICE:  pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation.  Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

---

dismissal for failure to state a cause of action in light of my recommendation regarding defendants' summary judgment motion.

It is further ORDERED that the Clerk of the Court serve a copy of

this report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge


Dated:      September 9, 2008
            Syracuse, NY